Plaintiffs, the widow and sole heir of P.M. Gaddis, deceased, instituted this suit on defendant's promissory note in favor of the deceased for $1,323.36 with interest and attorney's fee. The note is dated December 28, 1932, and matured on October 1, 1933.
Defendant resists the suit on the grounds that the note was procured through fraud and is null, void and unenforceable for want of a valid and legal consideration. Additionally, he averred that the note was never owned by the deceased and therefore is not now owned by plaintiffs. These defenses are amplified elaborately and will be further referred to in the course of this opinion. Defendant appealed from an adverse judgment.
For many years Gaddis Company, Inc., conducted an extensive furnishing business in Sabine and Natchitoches Parishes. P.M. Gaddis was its president and general manager. He solely directed its affairs and determined its policies. Its customers numbered some 300 farmers. The uniform practice was that the customers delivered to the company cotton annually produced by them as soon as ginned, to be applied on accounts when sold. Defendant traded with the company for many years, including 1929 and 1930, and regularly delivered to it or shipped for its account cotton produced by him. In 1929 and 1930 he delivered to the company 70 bales of cotton, weighing 36,267 pounds. This cotton was sold in the latter part of the year 1930 for about 16¢ per pound. The proceeds were sufficient to overpay defendant's account by approximately $1,500.
It was the company's uniform practice to sell its spot cotton to save carrying charges and invest the proceeds in futures, in the hope that the market would rise. This course was followed in defendant's case, but the cotton market steadily declined and when Gaddis Company was unable to protect its contracts with margins, it was forced to sell. The cotton brought only 7 7/8¢ per pound. After crediting defendant's account with the net proceeds of his 70 bales at this price, his debit balance was $1,323.36. Account sales were promptly rendered to him. He discussed the situation with Mr. Gaddis. The note sued on was then signed. He testified that he knew nothing of the sale of his spot cotton in 1930, but thought the price of 7 7/8¢ per pound was for spots. He continued to trade with the company.
When the note was signed, defendant was not indebted unto Gaddis personally for any amount. For this reason, he contends a fraud was practiced on him by having him execute a note in Gaddis' favor. He cannot read or write but appears to be possessed of good practical common sense. He contends that his account should have been credited with the net proceeds of the sale of the spot cotton, which, if done, would have left Gaddis Company, Inc., in debt to him for several hundred dollars. The defense of want of consideration is predicated upon this contention.
The fact that the note was made payable to Gaddis and not the company is satisfactorily explained. Gaddis was then advancing to the company funds of his own to enable it to operate and instead of making the note payable to the company, necessitating endorsement to him, it was drawn payable directly to himself and he paid its face amount to the company. Defendant's account was credited with the note. He has no valid reason to complain of this arrangement.
This case turns upon the question: Did the defendant, expressly or impliedly, authorize Gaddis Company, Inc., to handle his cotton as was done?
Defendant testified that he delivered the cotton to Gaddis Company, Inc., "to sell it — just like I had been doing", and instructed it to place the proceeds to his account. He also testified that he went to see Gaddis three times and "asked him about selling the cotton. He just put me off. Said cotton was going up". He was asked: "Had you directed him to sell it?" and answered: "Yes, sir". He also testified that at no time did he authorize the company to invest the proceeds of sale of his spot cotton in futures. He learned in 1935 the price the spot cotton brought and promptly called on Mr. Gaddis for a settlement based upon this sale. He testified that Gaddis then informed him that the cotton had *Page 847 
not been sold. If the reporter correctly recorded his testimony, he is obviously in error as this was after account sales had been rendered and the note signed. Mr. Gaddis died on September 28, 1937. He was in bad health for some time. Defendant says he last discussed a settlement with him about thirty days before his death. He says that to this last demand for a settlement, Gaddis replied: "`Why', he says, `I'm sick. You go ahead home and when I need you, I'll call you', and got up and walked off."
Mr. W.L. Freeman, who acted as bookkeeper for Gaddis Company, Inc., was well acquainted with the modus operandi of its business affairs. He was introduced as a witness by defendant, who, of course, vouches for the verity of his testimony.
He testified that it was the uniform practice of the customers of Gaddis Company, Inc., to deliver their cotton to it with complete authority to handle and dispose of as it saw fit; and that it was the invariable rule of the company to sell spot cotton in order to save carrying charges and invest the proceeds in futures; that this course was followed in 1929 and in 1930. If the market price rose, the customers received the benefit of the advance; if it declined, they took the loss. Freeman's testimony was taken out of court but as he appeared personally as a witness, this testimony was not used. The following question was propounded to him in court: "Mr. Freeman, can you state whether or not the method pursued in handling the cotton and making the credits and debits as you have related, was done by an agreement between Mr. Brown and Mr. Gaddis?"
He replied: "As far as I know, Mr. Brown's cotton was handled just like all the rest of the customers'. If there was any other agreement between Mr. Brown and Mr. Gaddis other than the way he handled it with all the other customers, I don't know about it. The customers left their cotton with Mr. Gaddis to handle as he saw fit, which was my understanding."
This witness further testified:
"Q. His account was very much smaller than what the cotton brought. The cotton brought over $5,000. A. He could have had a settlement then and drawn out that money at that time.
"Q. And had he been notified that his cotton had been sold and the balance was to his credit, he would have called for it, would he not? He could have called for it and withdrawn it? A. Yes, sir, if he had wanted to settle at that price.
"Q. That balance then, that cash balance, was his money, wasn't it? A. If he wanted to sell his cotton at that price, it was.
"Q. The cotton was sold? A. As far as he was concerned, the cotton wasn't sold.
"Q. Why not? A. He hadn't asked for a settlement, as far as I know.
"Q. You don't know that he had requested that his cotton be put on the market? A. I don't know.
* * * * * *
"Q. Wasn't it common knowledge throughout that community, and didn't really everybody in that community know that that was the practice that was carried on between Gaddis and Company, and all of its customers? A. Yes, sir.
"Q. Mr. Freeman, you mean that it was common knowledge that small farmers permitted the Gaddis Company to take their cotton and sell it and then invest those proceeds in the cotton gambling? A. It was the custom for them to turn their cotton to him in the fall and let him handle it as he wanted to. They thought he knew more about it than they did.
"Q. But not to sell it and put the proceeds in the cotton market? A. He was still responsible to them for the cotton, — At whatever price they wanted."
The testimony of Freeman supports the contention that all of the company's customers, after delivering cotton to it on account, in a way "forgot about it"; in other words, it was thereafter the company's cotton to do with as it thought best, subject to the right of each customer, under the uniform custom, at any time to demand that it be sold and to receive credit for its value as of the date of such demand; that until such demand was made, so far as concerns the customer, no sale had been made. When the spot cotton was converted into futures, so far as regards the customer's interest, his cotton continued to be on hand unsold. He knew of no modification of the custom rule in favor of defendant.
We are forced to the conclusion that since defendant dealt with Gaddis Company, Inc., for so many years and their business relations had been so uniformly satisfactory, he must have known exactly how his cotton had been handled by the *Page 848 
company, and possessed of such knowledge, he tacitly acquiesced in if he did not expressly consent to the method the 1929 and 1930 crops were handled. Had the market soared and the cotton then been sold, all would have commended Mr. Gaddis as being a sagacious student of the cotton market, ever watchful of his customers' welfare.
Defendant says that he once asked Mr. Gaddis to sell his cotton. He does not attempt to fix the date of the request nor the market price of cotton at that time. We cannot assume that at that time, whenever it was, the cotton would have sold for more than 7 7/8¢. It might have been worth less, as every one knows that the market value of all commercial commodities fluctuates under stress of unfavorable economic conditions, such as prevailed in 1930, 1931 and 1932.
It is of some significance that the 1929 cotton, being 20 bales, was carried by Gaddis Company, Inc., for twelve months (before it was augmented by the 1930 crop) without any request or demand for its sale by defendant. He testified that the company offered him 29¢ per pound for the 1929 crop of cotton, which he refused. He was willing, therefore, that the cotton be held indefinitely for a higher price. If loss followed, should not he bear it?
Gaddis made no effort to enforce collection of the note, although he held it for four years prior to his death. He used it as collateral to bank loans of his own. It was found, after his death, among his personal papers.
An employee, acting as collector, testified that Mr. Gaddis instructed him to make no demand on defendant to pay the note, but assigned no reason for this attitude. This is pointed to by defendant as corroborative of his convention that Gaddis did not own the note and never intended to do so. The fact that he borrowed on this note, with others, negatives the inference drawn from the above-mentioned attitude.
Defendant and all others who knew Mr. Gaddis well held him in the highest esteem. All concede that in dealing with his fellowmen he observed meticulously approved ethics. This record does no violence to this merited reputation.
It is reasonable to assume, as we do, that because of the long and intimate friendship between defendant and the deceased, he was unwilling to embarrass the defendant by pressing him for payment of the note, unless and until forced to do so from financial stress. This condition did not come about before the hand of death intervened. Defendant admits that after the company's affairs became involved and its credit impaired, Gaddis advised that the company could no longer finance his farming operations, but said that so long as its doors were open, defendant could have of that which it had. He traded with the company continuously until Gaddis' death, which occurred two years after defendant learned of the sale of the spot cotton. Why would he continue to trade with a man who he now says defrauded him?
Mr. Gaddis is not here to give his version of the transactions forming the basis of this suit. Defendant accredits him with some statements which, if true, are contrary to his own interest. The weight of such testimony should be determined in the light of the wise rule of evidence to the effect that declarations of a deceased person, even when against interest, are the weakest sort of evidence.
Defendant has failed to establish the special plea of want of consideration. The burden rests upon him, as plaintiff in plea, to prove by a preponderance of evidence the truth of the plea. Henderson v. Giraudeau, 15 La.Ann. 382; Teutonia Bank Trust Co. v. Buhler, 137 La. 5, 68 So. 194; Gulf Lumber Company v. Bender,173 La. 471, 137 So. 856.
For the reasons herein assigned, the judgment appealed from is affirmed with costs.
 On Application for Rehearing.