43 So.2d 613

## MOSS v. ROBINSON.

No. 39030.

Dec. 9, 1949.

Foster, Hall & Smith, Shreveport, for plaintiff-appellant.

M. T. Monsour, Shreveport, for appellee.

HAMITER, Justice.

Dr. Albert Moss is appealing from a judgment which rejected his demands against Robert Edward Robinson and dismissed this action.

In support of the decree the district judge assigned the following written reasons:

"This is a suit by the plaintiff against the defendant on a note for $20,000, which note was dated December 10, 1947, and was made payable on demand to the plaintiff, with the stipulated rate of interest at 4% per annum from demand. The suit was filed January 7, 1948.

"The defendant answered admitting that he signed the note sued on but denied that the plaintiff gave him any value therefor or that he received any consideration whatsoever for the note. He then set up in his answer a transaction which occurred on October 15, 1947, in which transaction he alleged that he was instrumental in buying some oil mineral interests and royalties for Dr. Moss, and that he executed the note sued on in an attempt to preserve the friendship which had existed between him and Dr. Moss for a period of several years.

"On the trial of the case the plaintiff offered in evidence the note and stipulated a credit of $871.42, and closed his case.

"The defendant then offered evidence in an attempt to show that the note had been given to Dr. Moss purely as a gesture of friendship, and a reassurance to Dr. Moss

that he would not lose anything by virtue of his having advanced $20,000 to be used to purchase 25 acres of royalty and mineral rights under some lands situated in Marion County, Texas, upon which there were seven producing oil wells. The testimony of plaintiff, defendant, and plaintiff's attorney, show conclusively that no consideration passed at the time of the execution of the note in the office of plaintiff's attorney. The evidence is conflicting as to just why the note was executed. Plaintiff and his attorney testified that the note was executed to evidence a pre-existing debt which was incurred by defendant when he drew a draft on plaintiff on October 15, 1947, payable to H. B. Carroll in the sum of $20,000. The draft in question was endorsed by H. B. Carroll and also by Dr. Albert Moss, plaintiff in the case. The defendant claimed that he executed the note to reassure Dr. Moss that he had not been taken advantage of in the deal of October 15th, and that Dr. Moss was to hold the note until such time as the properties in question failed to produce revenue, or until the properties were sold, and if a loss occurred to Dr. Moss that the note would be sufficient to reimburse him up to the amount of his loss.

"There admittedly being no consideration given for the note on the day of its execution, plaintiff, by virtue of the note, can be in no better position than he was following his allleged loan to the defendant from the time of the loan to the day of the execution of the note.

"The defendant having plead lack of consideration, and having set up in his answer circumstances casting suspicion upon the execution of the note, the burden of proving consideration shifted to the plaintiff, or the payee of the note. Columbia Restaurant v. Sadnovick, La.App., 157 So. 280.

"We are, therefore, called upon to decide whether plaintiff has shown by a preponderance of the testimony that the defendant received consideration for the execution of the note to plaintiff.

"The evidence shows that plaintiff and defendant had been very close personal friends for several years, and visited in each other's homes often. The plaintiff is an optometrist, practicing his profession with offices on Milam Street in Shreveport, Louisiana. The defendant is an oil operator, dealing in oil properties and handling transactions on oil properties as a broker.

"The testimony shows that on October 15, 1947, the defendant stopped by the plaintiff's place of business, as was his daily custom to do, and in their conversation the defendant informed the plaintiff that he was about to lose a 'good deal'. Plaintiff inquired about the deal, and after the defendant had told him what the deal was, the plaintiff agreed to put up $20,000 to purchase the deal.

"The question we are called upon to decide is whether plaintiff purchased the deal for himself or whether he loaned the money to Robinson and Robinson purchased the deal for his own account with the money

put up by Dr. Moss and became indebted to Dr. Moss for that amount.

"J. T. Mostyn, Jr., and J. R. Cornelius, Cornelius being an attorney at law of Jefferson, Texas, had forwarded the deeds to the mineral interests to the First National Bank of Shreveport, with a draft attached in the amount of $16,750, addressed to H. B. Carroll. These deeds constitute the deal we have referred to and shall continue to refer to as 'the deal' which was the deal that Robinson had told Dr. Moss that he was about to lose. Carroll had endeavored to, and was still endeavoring to, sell the deal for $20,000. The owners of the deal had stipulated a time limit on leaving the deal in escrow at the First National Bank, which time limit had expired but had been extended verbally by the owners to Carroll.

"After Dr. Moss had been told of the deal by Robinson he authorized Robinson to draw a draft on him for $20,000. This Robinson did, payable to the order of H. B. Carroll. The amount involved being rather substantial, the bank called Dr. Moss and Dr. Moss went to the bank and authorized the payment of the draft to Carroll by endorsing same. The bank then released the deeds which were made to Carroll as vendee. Carroll and Robinson then took the deeds to Jefferson, Texas, where Carroll executed a transfer of the mineral and royalty interests to Dr. Albert Moss in the office of Cornelius & Cornelius, Attorneys. Cornelius & Cornelius then wrote a title

opinion to Dr. Moss and mailed it to him at Shreveport.

"Mr. Robinson, on October 16, wrote to T. P. Fulton, Auditer of the Gulf Oil Corporation of Houston, Texas, in which letter he stated: 'Dr. Albert Moss, whom I represent, has puchased from H. B. Carroll * * *', a copy of which letter he mailed to Dr. Moss, the letter enclosing certified copies of the deeds and the instrument evidencing the ownership of the interest in Dr. Moss, the Gulf Oil Corporation being the purchaser of the oil from the interests of Moss.

"On October 25, 1947, Robinson addressed another letter to Mr. Fulton in connection with the transfer to Dr. Moss, and mailed Dr. Moss a copy of this letter. The royalty check did not arrive as soon as Dr. Moss expected that it would so he called Mr. Fulton up by long distance telephone and inquired about the delay. After a slight delay Dr. Moss received a check for the first month's royalty in the amount of $287.

"Mr. Robinson had represented to Dr. Moss that the property should pay from $700 to $900 per month, and possibly $1000 per month. Mr. Robinson had exhibited an oil-run sheet from the Gulf Oil Corporation which showed the July and August returns and this check was so far below what he had expected he began to investigate and made a trip to Jefferson, Texas, and talked to Mr. Mostyn on the lease. He then talked to Mr. Robinson to see why the interests

had not been paying off as represented to him. Mr. Robinson was unable to give any explanation for the decline in production. Dr. Moss then became suspicious and came to the conclusion that * * *. (Remainder of sentence omitted from record.) Mr. Robinson, in an effort to assuage Dr. Moss' feelings and restore his confidence, stated on several occasions that Dr. Moss would not lose a thing; that he would personally see to that. (Parenthesis ours.)

"The subsequent checks received by Dr. Moss, a total of four in number, ranged from $287 down to $201 per month. Mr. Arthur Gayle, who is operator of the lease, explained that the wells had lost some bottom hole pressure but that the production had levelled off on an even keel and that he did not anticipate any further decline in production.

"Mr. H. B. Carroll testified that when Dr. Moss came to the bank and endorsed the draft drawn by Mr. Robinson, that he stated that he was buying the property and that he wanted all the papers in his name and that he would take care of Robinson's commission.

"Dr. Moss' testimony in this case is so vague, contradictory and uncertain that it is almost incoherent. He testified, however, that he and Robinson were such good friends that he would have loaned Robinson thousands of dollars upon Robinson's mere representation that he needed some money, without any security whatever.

"Now let's look to see whether or not the transaction has any of the earmarks of a confidence game as Dr. Moss suspects was worked on him. He apparently suspects that Robinson and Carroll worked the deal in collusion to defraud him. If this is true, the most they could have made out of the transaction was $3250, which would have been $1625 divided between them. If Robinson had been cultivating Dr. Moss' confidence with the view of defrauding him, according to Dr. Moss, he could have gotten many times $1625 without any evidence of indebtedness. Further, Carroll and Robinson left the bank with the papers in their possession, evidencing the purchase of the property, and it would have been a simple enough matter for them to have transferred a part of the interests to Dr. Moss and retained the balance for themselves. However, all of the interests involved in the deal were transferred to Dr. Moss and the title opinion was furnished by the Texas attorneys. This has all completely destroyed, in our minds, the question of Dr. Moss being defrauded in the deal. Of course, Dr. Moss, having lived in and around oil production for many years, certainly knows that the oil business is of a speculative nature.

"If we accept Dr. Moss' position that he loaned his friend this money to buy an oil deal we are unable to understand why he should be so frantic about the outcome of his friend's deal. It occurs to us that if Robinson had made a bad deal for himself

that his friend Dr. Moss should be sympathetic towards him rather than belligerent. If the deal was Robinson's deal it is no concern of Dr. Moss as to whether the property pays out or not. He has the same recourse against Robinson that he had before the execution of the note.

"One thing about this case that strikes us as more than ordinary is the fact that nothing was ever said about terms of repayment, or as to what disposition was to be made of the royalty payments which Dr. Moss knew were being mailed to him and which he was appropriating to his own use. Dr. Moss was asked whether or not he told friends on the streets that he owned oil interests that were going to pay him large monthly returns. He did not deny making these statements. He had at all times exclusive control of the deal.

"This case was brought to a climax when an attorney stopped by Dr. Moss' place of business and evidently planted seeds of distrust in Dr. Moss' mind and then sought to represent Dr. Moss in a suit on the note against the defendant. After this solicitation by the attorney, Dr. Moss immediately went to his personal attorneys, who are the attorneys of record in this case, and had them bring the suit. We can't help but notice the fact that after the execution of the note by Robinson that Dr. Moss' friendship for Robinson continued. In fact, Dr. Moss and his wife had Christmas dinner with the Robinsons. Of course, Robinson had no idea when he executed the note that

a suit would be brought on the note in so short a time.

"Dr. Moss, in our opinion, bought this deal thinking that it would pay out in two or three years and was so disappointed when the payments declined to the extent that they did that he figured that he had been defrauded. In view of Mr. Gayle's testimony and of the other testimony in the record it appears to us that Dr. Moss still has a good deal in the property, as an investment returning him 12% per year. A one-half of which he stated belonged to his wife.

"From the evidence it appears that Dr. Moss is a man of moderate means, financially speaking, and is 69 years of age. We are unable to accept his testimony that he, having invested this amount of money, never looked at the deeds and papers and didn't know that the property was in his name.

"The attorney for the plaintiff in this case testified that Mr. Robinson stated that at the time he executed the note in the attorney's office, that he owed this money to Dr. Moss and that if it would make him feel any better he would give the note to Dr. Moss. In view of all the testimony and the past relations existing between the plaintiff and defendant in this case, we can easily understand why defendant in his anxiety to soothe the ruffled feelings of Dr. Moss and preserve their friendship would make such a statement. However, from all the facts and circumstances in the case, we are

unable to find where Robinson ever received one dime out of this transaction but on the contrary has expended his time and some money in obtaining title opinions and paying for recording and certifying deeds.

"It, therefore, is our opinion that the note sued on was given without consideration whatever, and the plea of want of consideration is well founded. Accordingly, there is judgment in favor of defendant dismissing plaintiff's suit at his costs."

In their brief filed in this court counsel for appellant, among other things, state:

"Plaintiff contends that there was consideration and that this was the advancing of $20,000.00 to defendant on October 15, 1947.

    \*    \*    \*    \*    \*    \*

"We submit that the Judge of the lower court erred in at least one of the following particulars:

"(1) In his interpretation of the law relative to burden of proof.

"(2) In his ignoring of the law concerning the obligations created by drafts.

"(3) In his finding of fact which we submit is contrary to the law and the evidence."

■ The jurisprudence of this state, with reference to appellant's first complaint, appears to support the view that when a plaintiff introduces in evidence the negotiable instrument sued on (legally presumed to have been given for value received) he is not required in the first instance to produce any further proof of consideration, notwithstanding that the defendant has specifically pleaded a want thereof. The defendant, thereupon, has the burden of going forward with the evidence and rebutting the prima facie case (in favor of plaintiff) thus made out. Henderson v. Giraudeau, 15 La.Ann. 382; Teutonia Bank & Trust Company v. Buhler, 137 La. 5, 68 So. 194; Gulf Lumber Company v. Bender, 173 La. 471, 137 So. 856; Reconstruction Finance Corporation v. Hutchinson, La.App., 1 So.2d 423; Gaddis v. Brown, La.App., 1 So.2d 845; and Jaccuzzo v. Fabregas, La.App., 12 So.2d 16. But if the defendant offers evidence which overcomes the prima facie case, that is, casts doubt upon the reality of the consideration, the ultimate burden of proving consideration, by evidence that preponderates, is on the plaintiff. Harrison v. Poole, 4 Rob. 193; Wooten v. Harrison, 9 La.Ann. 234; Martin v. Donovan, 15 La.Ann. 41; Mossop v. His Creditors, 41 La.Ann. 296, 6 So. 134; Succession of Coste, 43 La.Ann. 144, 9 So. 62; Succession of Galiano, La. App., 195 So. 377 (writ of certiorari denied); Bank of Coushatta v. Debose, La. App., 10 So.2d 386; Borel v. Living, La. App., 28 So.2d 392; 8 Corpus Juris, Section 1299, verbo Bills and Notes; 8 American Jurisprudence, Section 1006, verbo Bills and Notes; 11 Corpus Juris Secundum, § 655, verbo Bills and Notes.

Incorrect, therefore, was the trial judge's observation (quoted above) that the burden

of proving consideration shifted to the plaintiff when defendant set up in the answer circumstances casting suspicion upon the execution of the note. But he correctly commented thereafter (also quoted) that a question for decision is whether plaintiff has shown by a preponderance of the testimony that the defendant received consideration for the note's execution. This is so because on the trial of the case defendant introduced evidence which cast doubt on the reality of the consideration, thereby overcoming the prima facie case established by the offering of the note and causing the ultimate burden to shift to plaintiff.

Appellant's second complaint, i. e., that the trial judge ignored the law concerning the obligations created by drafts, is predicated on the assumption that the draft involved in this case was accepted and paid by plaintiff for the accommodation and benefit of the defendant. Necessarily, therefore, it is interrelated with the third and final complaint which is that the judge erred in his finding of fact.

After a careful and thorough consideration of all of the evidence in the record we are unable to conclude, as appellant would have us do, that manifest error was committed in determining the factual issue presented. The numerous circumstances surrounding the acquisition of the mineral interests, disclosed by the record and pointed out and discussed by the district judge (we shall not recount them), tend to support his finding that the defend-

ant obtained nothing in the transaction and hence received no consideration whatever for the note. Also, supporting such conclusion, and important to notice, is the further circumstance that plaintiff has at no time tendered to defendant, the asserted owner, the acquired interests.

For the reasons assigned the judgment appealed from is affirmed.