SAMUEL, Judge.
Plaintiff instituted this suit seeking to be recognized as the owner of certain real estate designated by Municipal Numbers 7700-7702 Hickory Street in the City of New Orleans. The defendant answered asserting her own ownership of the property and, alternatively and in reconvention, prayed for judgment against the plaintiff in the sum of $3,889.52 for repairs and reconstruction allegedly made to the property.
The defendant died during the pen-dency of the litigation in the trial court and her testamentary executrix, together with her sole legal heir, were made parties defendant. The testamentary executrix and the heir both adopted the answer and prayer filed by the original defendant.
In due course there was judgment by the trial court, on the main demand, recognizing plaintiff as the owner of the real estate. There was also judgment, on the re-conventional demand, in favor of the testamentary executrix in the amount of $2,-188.52. The testamentary executrix has taken a suspensive and a devolutive appeal, and the heir has taken a devolutive appeal, from that part of the judgment which recognized plaintiff as the owner of the property (in this connection see Schwarz v. Friedenburg, 239 La. 427, 118 So.2d 875). No appeal has been taken from the money judgment on the reconventional demand.
The appeals were originally taken to the Supreme Court of Louisiana and were transferred to this Court of Appeal under the authority of Art. 7, § 29, of the Constitution of Louisiana of 1921, as amended in 1958, LSA.
On October 17, 1947, the property here involved, a double dwelling, was transferred by plaintiff and her husband to her brother, Rudolph Friedenburg, for a recited consideration of $1,000.00 cash and a note for $3,500.00. The note was secured by a mortgage on the property. On the back of the note appears a notation, which the record reveals was made by plaintiff, to the effect that $140.00 was paid on January 19, 1948, said amount being interest for one year. *373 On July 29, 1948, plaintiff took from her brother an additional mortgage in the amount of $5,000.00 on the same property. On January 9, 1952, both mortgages were cancelled by plaintiff.
On December 31, 1954, Rudolph Frieden-burg signed a counter letter which stated that title to the property had been placed in his name for convenience only, that in reality no consideration had been paid for the transfer to him, that he bound himself, his heirs, executors and administrators to convey the property to the plaintiff whenever required to do so, and that for such conveyance no price or consideration was to be paid to him. Plaintiff’s husband had died after the date of the transfer and prior to the date of the counter letter and plaintiff has been placed in possession of all of his property.
Rudolph Friedenburg died on January 19, 1955, and the counter letter was registered in the conveyance records of Orleans Parish on the following day, January 20, 1955. Demand was then made by plaintiff •upon the original defendant, Rudolph Fried-enburg’s widow and heir, to re-transfer the property back to plaintiff and this suit was brought upon defendant’s refusal to comply.
It is the contention of defendants that there was a valid sale of the property to Rudolph Friedenburg and that the counter letter was a simulation, given without consent because of-physical and mental illness, and signed by Mr. Friedenburg, without knowledge or understanding of the contents thereof, only because he was forced to do so; that, accordingly, said counter letter should be annulled and set aside.
Plaintiff produced three witnesses: herself, her attorney, Miss Irene J. Barrios, and a Mrs. M. Yelliott.
Plaintiff testified that her brother, Rudolph Friedenburg, was in poor financial circumstances with only a small income from a fire department pension and social security. He lived in the house for many years without paying rent and plaintiff and her husband transferred the property to him without receiving any consideration whatsoever, either at the time of the transfer or at any other time, permitting him to collect the rent from the other side of the double dwelling in order to help him. He drank and gambled to an extent which made her afraid that he would lose the property and it was for this reason that she took and held the two mortgages. Although she had received no such payment, she had made a notation of a $140.00 interest payment on the back of the first note in order to prevent the running of prescription. She cancelled these mortgages at her brother’s request in order that he might have peace of mind concerning the occupancy of the property by himself and his wife, particularly his wife after his death, only after he had asked her to do so many times and constantly worried her with such requests. He visited her at her home almost every day and she helped him financially on frequent occasions, giving him money and paying many of his debts with loan companies, buying an automobile for him, etc. Among the documentary proofs offered by her in this connection were can-celled checks for an automobile in the amount of $1,629.00, for a final payment of $331.75 on a promissory note held by a loan company, and for lumber for a garage on the property in the amount of $160.37. She further testified, in effect, that she wanted him to execute a counter letter with regard to the property and he agreed to do this; that at his suggestion, and for the purpose of having the counter letter signed, she went to his home during the late evening (about 8 P.M.) of December 31, 1954, with her two attorneys, Puneky and Barrios. On this occasion her brother informed her and the attorneys that he was having guests and he did not invite them into his home but instead suggested they drive to an oil station a block or so away where he kept his car. At the oil station he signed the counter letter in the presence of the plaintiff, the two attorneys and the operator of the station. Before the sign *374 ing one of the attorneys read the counter letter aloud and asked him if he understood what he was signing and his answer was that he did. After his death, and at the request of his widow, plaintiff paid her brother’s hospital bill in' the amount of $65.10, his funeral hill of $655.40, and $510.-00 for cemetery lots (the lots were for the use of plaintiff’s brother and his wife) and a marker. Cancelled checks to prove these payments were introduced into evidence. Her testimony is clear to the effect that her brother agreed to sign the counter letter, understood the import thereof, and did sign freely and voluntarily. Cross-examination of plaintiff established that some two or three months before the passage of the sale in question Rudolph Friedenburg received approximately $13,000.00 from the sale of property owned by him in the City of New Orleans.
The attorney, Miss Irene J. Barrios, testified that plaintiff had made arrangements with Mr. Friedenburg to go to the latter’s home and have the counter letter signed. Her testimony with regard to the signing of the counter letter is substantially the same as that of plaintiff.
Mrs. M. Yelliott, for nine years the occupant of one side of the double dwelling here involved, testified that she had spoken to Mr. & Mrs. Rudolph Friedenburg about buying the property; that, because she paid them the rent, she was under the impression that they were the owners but after Mr. Friedenburg’s death his widow informed this witness that she, Mrs. Friedenburg, was unable to sell the property because she did not own it, that the property was owned by the plaintiff, who had permitted her and her husband to live in the property and collect the rents.
The defendants produced two witnesses: a former policeman named Quartano and a physician, Dr. John A. White.
Quartano testified that on January 1, 1955, while he was at work as a policeman in downtown New Orleans, Rudolph Fried-enburg, whom he had known for about five years, approached him in a nervous, excited and worried state and told him that the previous night his sister and two lawyers had taken him to an oil station and forced him to sign a letter, the contents of which were unknown to him, repeating several times that he didn’t want to sign the letter and didn’t know what it contained, but had been forced to sign by his sister and her lawyers.
Dr. White testified that he had treated Rudolph Friedenburg as a patient from July, 1949, to July, 1950, for arthritis, diabetes, hypertension and Reynaud’s disease of the leg; that thereafter he did not see him again for approximately five years until he was called to visit the patient in the latter’s home on January 15, 1955, on which date the man was bedridden, almost comatose and at times confused to the extent that anyone that sick would naturally be confused. At that time, January 15, 1955, the doctor did not know how long Mr. Friedenburg had been in that condition and, in response to a direct question, further testified that he could not say what the patient’s mental condition was prior to January 15, 1955.
We pretermit the question, as has been done by both counsel in argument and in brief, of the right of the original defendant, her succession or her heir to attack the counter letter under LSA-Civil Code, Art. 2239, which provides that counter letters are effective against all except creditors or bona fide purchasers and gives the right to forced heirs to annul the same by parol evidence, and under LSA-Civil Code, Art. 2404, which prohibits the husband from making a conveyance inter vivos, by a gratuitous title, of the immovables of the community unless it be for the establishment of the children of the marriage.
We find little or no probative value in the argument, stressed by counsel for defendants, that Rudolph Friedenburg was financially able to pay the full consideration for the transfer of the property to him by plaintiff and her husband because, *375 only two or three months before that event, he had received about $13,000.00. For the record also reveals that there is a possibility that he had invested that amount in certain bonds which he may or may not have left at his death. No proof having been offered as to the value of his estate, or of what that estate consisted, it is quite possible that the amount in question was never expended by him and the defendants have failed to prove otherwise.
The contention that the counter letter was given without consent because of the mental and physical illness of Rudolph Friedenburg is without merit. While the mental “alienation” manifested itself within ten days previous to his decease, and while the death occurred within thirty days after the date of the counter letter, so that the act can be contested for cause of insanity under the provisions of LSA-Civil Code, Arts. 403 and 1788, subd. 5, the proof here offered as to insanity falls far short of that which is required in order to invalidate the act. LSA-Civil Code, Art. 1788, subd. 2 provides:
“As to contracts, made prior to the application for the interdiction, they can only be invalidated by proving the incapacity to have existed at the time the contracts were made.”
Here the only evidence offered as to insanity was the testimony of the doctor who saw Rudolph Friedenburg, for the first time in five years, when he was desperately ill only four days before his death. That doctor, as pointed out above, testified that the man was “confused” at that time but he made it very clear that he could give no testimony at all concerning Mr. Fried-enburg’s state of mind at the time the counter letter was signed. There is no evidence to the effect that the man was seriously ill, either physically or mentally, on December 31, 1954. Indeed, on that date and on the following day he was well enough to, and did, leave his house without assistance. In order to invalidate the counter letter on the grounds of insanity defendants, under the clear provisions of the above quoted LSA-Civil Code, Art. 1788, subd. 2, must prove mental incapacity at the time the counter letter was signed. The record is completely devoid of such proof.
Similarly, defendants’ proof in support of their second contention, i. e., that Mr. Friedenburg signed the counter letter without knowledge or understanding of its - contents and only because he was forced to do so, falls far short of that which the law requires. The only evidence adduced in support of this contention was the testimony of the witness Quartano concerning what Mr. Friedenburg told him on January 1, 1955. Testimony relative to an oral statement made by a person deceased at the time such testimony is given is one of the weakest kinds of evidence (an observation which, of course, must also apply to the testimony of Mrs. Yelliott) and, although ordinarily admissible, is of little value in the absence of corroboration. See Larocca v. Ofrias, 231 La. 292, 91 So.2d 351; Gaddis v. Brown, La.App., 1 So.2d 845; Succession of Crawford, 16 La.App. 326, 134 So. 269. Here it is completely overcome by the testimony, of the plaintiff and' Miss Barrios, which the trial judge quite obviously believed. Defendants have failed to prove any of the facts, i. e., error, fraud, violence or threats, which vitiate consent under LSA-Civil Code, Art. 1819.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.